IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.  1:23-MC-00037-JG |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE JAMES S. GWIN |
| vs. | ) | |
| | ) | MAGISTRATE JUDGE |
| EATON CORPORATION, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Respondent. | ) | **REPORT & RECOMMENDATION** |
| | ) | |
| | ) | |

This matter is before the magistrate judge pursuant to Local Rule 72.1.  Before the Court is the Government's Petition to Enforce IRS Summons.  (Doc. No. 1.)  For the following reasons, the undersigned recommends the Court DENY the Petition to Enforce IRS Summons.  (*Id.*)

### I.     Factual and Procedural Background

On June 9, 2023, Petitioner filed its Petition to Enforce IRS Summons ("Petition").  (Doc. No. 1.)

On August 29, 2023, Judge Gwin referred this case to the undersigned for a report and recommendation.  (Doc. No. 2.)  On September 1, 2023, the Court set a show cause hearing for November 1, 2023.  (Doc. No. 3.)

On September 28, 2023, the parties filed a joint motion to continue the show cause hearing and modify the briefing schedule.  (Doc. No. 5.)  The next day, the Court granted the motion and reset the show cause hearing for November 6, 2023.  (Non-document Order dated September 29, 2023.)

On October 18, 2023, the parties filed a joint motion to modify the briefing schedule and set procedures for the November 6, 2023 hearing.  (Doc. No. 8.)  In their motion, the parties informed the Court they had agreed to treat the November 6, 2023 hearing "as something more akin to a settlement conference

1

than a contested hearing" and requested "that the Court proceed with that understanding in mind." (*Id.* at 1.)

On October 19, 2023, the Court held a telephonic status conference with the parties. (Non-document Order dated October 19, 2023.) Given the information discussed during the conference, the Court converted the November 6, 2023 hearing to a settlement conference. (*Id.*)

On November 6, 2023, the Court conducted a settlement conference with the parties. (Non-document Order dated November 6, 2023.) The parties were able to reach an agreement on some of the outstanding issues. (*Id.*) The Court ordered the parties to file a joint notice of resolution as to the matters resolved by close of business on November 15, 2023. (*Id.*) The parties stipulated that the remaining issues would be resolved on briefs, and the Court issued a briefing schedule. (*Id.*)

On November 15, 2023, the parties filed a joint notice of resolution as to the matters resolved at the settlement conference. (Doc. No. 11.)

That same day, Respondent filed its brief in opposition to the Petition. (Doc. No. 12.)

On November 22, 2023, Petitioner filed its reply in support of the Petition. (Doc. No. 13.)

On November 29, 2023, Respondent filed a motion for leave to file a sur-reply (Doc. No. 14), which the Court granted. (Non-document Order dated November 30, 2023.)

On December 1, 2023, Petitioner filed a motion requesting the Court set a deadline of December 4, 2023, for the filing of Respondent's sur-reply. (Doc. No. 15.)

On December 4, 2023, the Court granted Petitioner's motion requesting a deadline of December 4, 2023, for the filing of Respondent's sur-reply. (Non-document Order dated December 4, 2023.)

That same day, Respondent filed its sur-reply. (Doc. No. 16.)

## II. Law and Analysis

The sole issue remaining before the Court is whether Respondent must produce confidential performance evaluations for a certain number of its foreign employees. (Doc. No. 12 at 1.) Respondent argues that the Court should deny Petitioner's request for two reasons: "(1) the IRS has not met the relevant legal standard to enforce a summons for personnel records, and (2) compliance with the IRS's request would require Eaton to violate foreign data privacy law and subject itself to significant liability, despite alternative avenues for the IRS to obtain any relevant information." (*Id.*) Respondent asserts that "[t]his Court has already denied a summons issued by the IRS to Eaton under circumstances strikingly similar to this case." (*Id.* at 5) (citing *United States v. Eaton Corp.*, Case Nos. Nos. 12 MC 24, 12 MC 25, 12 MC 26, 12 MC 27, 2012 WL 3486910 (N.D. Ohio Aug. 15, 2012)) ("*Eaton I*"). Respondent maintains the summonsed information is available to Petitioner by alternative means and Petitioner fails to make a compelling showing of relevance. (*Id.* at 5-7.) Respondent further argues that the production of the evaluations would cause it to violate the European Union's General Data Protection Regulation ("GDPR"). (*Id.* at 7.)

Petitioner responds that "[t]he IRS believes that the evaluations at issue, which relate to research and development personnel," are relevant "because of what Eaton's own employees told the IRS about their performance reviews." (Doc. No. 13 at 2.) Petitioner asserts that, based on the interviews it has conducted, it "reasonably expects the summonsed evaluations to contain contemporaneous documentation of the work done by value-generating employees during the years under audit," and "[t]hat information is relevant to the broader inquiry." (*Id.* at 2-3.) Petitioner argues that it has shown the summonsed evaluations "may be relevant to the audit," which "is all that is needed to shift the burden to Eaton to show bad faith by the IRS," and Respondent has failed to show bad faith. (*Id.* at 3.) Petitioner maintains that *Eaton I* "is inapposite," as in this case Petitioner has not "sought or received any of the evaluations from a different source (and indeed, one *Powell* factor asks whether the IRS already has the summonsed documents)" and Petitioner "is

3

not speculating that the evaluations may be relevant, as testimony from other Eaton employees shows why the IRS believes that they contain contemporaneous documentation relevant to the audit." (*Id.* at 7.) In addition, Petitioner argues it would "be a mistake to read *Eaton I* as establishing a rule that interviews are necessarily an adequate substitute for production of employee evaluations, as Eaton seems to have done." (*Id.*) Petitioner also disputes that foreign data privacy law prevents production of the summonsed evaluations. (*Id.* at 9-10.)

In its sur-reply, Respondent argues that "where the IRS seeks employee evaluations, this Court has, in fact, limited the IRS's summons authority," finding in *Eaton I* that "the IRS failed to 'persuasively demonstrate[]' the relevance of a former employee's evaluations, despite an IRS agent's affidavit articulating a theory of relevance." (Doc. No. 16 at 1) (citing *Eaton I*.) Respondent asserts that Petitioner fails to "persuasively demonstrate relevance and need," as Petitioner's theory of relevance is "constantly shifting" and Petitioner "has already obtained adequate data regarding the domestic employees' activities. . . . and has alternative means to get any additional information. . . ." (*Id.* at 3.) Respondent further argues that Petitioner's reply misapplies several relevant factors in determining whether foreign data privacy law prevents production. (*Id.* at 4-5.)

**A.      Relevance of Summonsed Information**

This Court has previously explained the relevant legal standards concerning a petition to enforce an IRS summons:

> In order to ensure the proper determination of tax liability, Congress "has endowed the IRS with expansive information-gathering authority." *United States v. Monumental Life Ins. Co.,* 440 F.3d 729, 732 (6th Cir.2006), citing *United States v. Arthur Young & Co.,* 465 U.S. 805, 816, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984). Section 7602 of the Internal Revenue Code, 26 U.S.C. § 7602, is the "centerpiece of that congressional design." *Id.* at 733. Under Section 7602, the Commissioner of the IRS is authorized, "[f]or the purpose of ascertaining the correctness of any return ..., [t]o examine any books, papers, records, or other data which may be relevant or material to such inquiry" and "[t]o summon the

> person liable for tax or required to perform the act, or any officer or employee of such person ... to appear before the Secretary at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material of such inquiry." 26 U.S.C. § 7602(a) (1) and (2).
>
> The courts are authorized to enforce this summons power. "Proceedings seeking enforcement of an IRS summons are intended to be summary in nature." *Monumental Life,* 440 F.3d at 736. The decision of whether to enforce an IRS summons is governed by the analytical framework set forth by the Supreme Court in *United States v. Powell,* 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964). Under this analytical framework, the government must first establish a *prima facie* case for enforcement by demonstrating that: (1) the investigation has a legitimate purpose; (2) the information summoned is relevant to that purpose; (3) the documents sought are not already in the IRS's possession; and (4) the procedural steps required by the tax code have been followed. "The requisite showing is generally made by the submission of the affidavit of the agent who issued the summons and who is seeking enforcement." *Monumental Life,* 440 F.3d at 733.
>
> Once the government has made this *prima facie* showing, the burden shifts to the party being summoned to either disprove the elements of the *prima facie* case or "demonstrate that judicial enforcement of the summons would otherwise constitute an abuse of the court's process." *Id.*

*Eaton I*, 2012 WL 3486910, at *2.

In *Eaton I*, the IRS sought the production of the performance evaluations for John Semanchik, a former employee of Eaton's Tax Department, for the years 2001-2006. *Id.* at *13. Eaton argued that the evaluations implicated privacy concerns and were protected under federal case law, and the IRS had not made an adequate showing of relevance to overcome the privacy concerns. *Id.* In the IRS agent's affidavit in support of the petition to enforce the summons, the IRS agent averred that Semanchik "had extensive knowledge of the taxpayer's offshore operations and a key role in the implementation and interpretation of two Advanced Pricing Agreements ... that covered the two years at issue" and these evaluations "likely contain information that sheds light on the taxpayer's pricing methodology as reported on the tax returns as well as the taxpayer's interpretation of the APA transfer methodology." *Id.* In contrast to the case at bar,

5

the IRS had conducted eight days of interviews with Semanchik, and Semanchik had produced his performance evaluations for 2005 and 2008 in response to an IRS summons issued to Semanchik in his individual capacity. *Id.*

As it has argued in this case, Eaton argued that these records should not be produced absent a compelling showing of relevance, and that the IRS had not established any relevance, let alone compelling relevance, of these records. *Id.* Eaton asserted that there was no reason to believe any substantive information about its transfer pricing would be included in these performance evaluations, and noted it was "telling" that "although the IRS has reviewed four of Mr. Semanchik's performance evaluations for the two tax years that were under examination, Petitioner has filed [sic] to identify any relevant information obtained from those evaluations, thus, confirming the 'speculative' nature of the IRS's request." *Id.* at 14.

As it has argued in this case, the IRS disagreed that a heightened level of relevance was necessary and maintained that the performance evaluations were relevant. *Id.* The Court noted that "[t]he only statements [IRS Agent] Gearhart makes in his affidavit pertinent to the relevance of the performance evaluations sought in the present summons are that Mr. Semanchik described himself as 'knowledgeable' about the issues under investigation in several of the performance evaluations the IRS obtained" and that Semanchik's evaluations for 2001-2004 were "'likely to contain information about Eaton's APA, Eaton's inter-company transfer pricing, and transfers of assets out of Puerto Rico.'" *Id.*

The Court found as follows:

> The IRS has not persuasively demonstrated the relevance of Mr. Semanchik's performance evaluations. The declarations of Agent Babija and Mr. Gearhart on which the IRS relies, stating that other performance evaluations for Mr. Semanchik indicate that Mr. Semanchik professes knowledge about the tax issues under investigation, do not indicate that Mr. Semanchik's performance evaluations actually contain any substantive information as to Mr. Semanchik's "knowledge." Significantly, the IRS does not dispute Eaton's assertion in its opposition brief that the IRS has failed to identify any relevant information

> obtained from the IRS's review of other performance evaluations for Mr. Semanchik.
>
> On the other hand, Eaton has persuasively demonstrated that the IRS's position is purely speculative that the performance evaluations sought "are likely to contain information" about Eaton's transfer pricing. The IRS has come forward with no reason to indicate that the performance evaluations sought contain relevant substantive information. Furthermore, as Eaton persuasively argues, there is no need for the IRS to pursue such a speculative avenue of discovery to learn of Mr. Semanchik's "knowledge" (by seeking Mr. Semanchik's performance evaluations) because the IRS has had the opportunity during its extensive investigation to interview Mr. Semanchik personally (for eight days) about his knowledge, and the IRS obtained the non-privileged materials contained in Mr. Semanchik's files and binders in connection with other discovery requests.
>
> The petition for enforcement of the summons in 12 MC 2612 MC 26 is denied. The summonsed performance evaluations of Mr. Semanchik for the years 2001 through 2004 have not been shown to be relevant to a legitimate purpose.

*Id.* at **14-15.

In the instant case, IRS Agent Keith Griffith II, signed an affidavit averring that the summonsed evaluations "may be relevant to, and can reasonably be expected to cast light upon, the investigation described in Paragraph 3, above." (Doc. No. 1-1 at 2.) In a second affidavit, Agent Griffith II averred that certain Eaton employees had testified as follows regarding performance evaluations:

> 6. One senior Eaton employee testified that Eaton's performance evaluations typically include "some level of quantitative reporting as to how [the employee] matured technology or did what we said at [the] beginning of the year was your goals"; in some instances, an evaluation might also include "a guess at the revenue we thought we were going to hit as just a place holder that represents the maturity of the product."
>
> 7. Another employee, a vice president, testified that Eaton's annual performance evaluations would include the employee's "accomplishments" for the year, and that Eaton uses the evaluations to "track milestones in the projects because that's how you make people accountable."
>
> 8. Another Eaton employee, a senior vice president, testified that evaluations were used to "look at the objectives, and we can state, did you hit them and then say, okay, you did or you didn't."

7

> 9. Similarly, an engineering manager confirmed that annual evaluations "definitely" contained information about "specific projects, products, product lines" and further added that, "[i]f an employee was assigned to work on a certain project during the year, . . . he or she's going to be evaluated on how well he did towards completing that project."

(Doc. No. 13-1 at 1-2.) Agent Griffith II further averred that, "[b]ased on these and other interviews, the IRS believes the employee evaluations requested by the summons in this case are likely to contain project-specific, contemporaneous documentation of employee roles and responsibilities for the employees at issue. I believe this kind of information may be relevant to the audit because it may help show what kind of control Eaton continued to exercise over the transferred intellectual property assets after they were transferred to a lower-tax jurisdiction (Ireland)." (*Id.* at 2.)

In this regard, then, Petitioner has made a greater attempt of showing relevance than IRS agents in their affidavits in *Eaton I*. However, the Court agrees with Eaton that "a performance evaluation, by its nature, contains irrelevant qualitative judgments and offers only a glimpse into a single employee's work." (Doc. No. 12 at 6.) While performance evaluations may indeed contain project-specific information or project milestones, they would be couched in terms of the evaluated employee's performance, as evidenced by the quoted testimony in Agent Griffith II's affidavit. Vice President of Tax for Eaton, Minghe (Marvin) Bai, averred in an affidavit that, based on his experience at Eaton, "employee performance evaluations are character or byte-limited, and contain qualitative reviews from the employees and their supervisors" and contain "sensitive information regarding job performance." (Doc. No. 12-1 at 2.) In a second affidavit, Mr. Bai averred as follows:

> The Reply does not mention or quote from an IRS interview of a former senior Eaton executive who, during the years under audit, supervised many of the foreign employees whose evaluations have been summonsed. In that interview, the executive explained that Eaton's employee evaluations are not intended to document project-specific details, but instead are "based on competencies and strengths and development." The executive also noted that evaluations for their direct reports focused on "how well [the direct reports] performed . . . against

8

> their goals." This is consistent with the purpose of the employee evaluations sought by the IRS, which is to provide an annual mechanism for candid evaluation and feedback regarding individual employees' performance overall, not to track or document projects.

(Doc. No. 16-1 at 2.) In addition, Mr. Bai further avers that Petitioner has never told Respondent the reason it seeks the performance evaluations is to determine "whether Eaton 'continued to exercise' 'control' over the IP it transferred to Ireland in 2017," and that "none of the employees whose interviews the government cites bore any supervisorial connection to the foreign employees whose performance evaluations have been summonsed." (*Id.*)

The Court notes that Respondent has offered "less-intrusive alternatives" to Petitioner, such as witness interviews and/or written explanations of job duties and projects, in order for Petitioner to obtain the project-related information it seeks. (Doc. No. 12 at 6-7; Doc. No. 12-1 at 3-4.) The Court agrees with Petitioner that *Eaton I* does not establish "a rule that interviews are necessarily an adequate substitute for production of employee evaluations" and "did not attempt to prescribe any fixed sequence the IRS must follow in its investigations." (Doc. No. 13 at 7-8.) The Court also agrees that it is not for Respondent to dictate the course of Petitioner's investigation. (*Id.* at 8.) However, the Court concludes that Petitioner has not shown the relevance of the employee evaluations to its investigation, nor has Petitioner offered any explanation as to why the alternatives offered by Respondent are inadequate means for it to obtain the project-specific information it seeks.

The Court finds that the summonsed performance evaluations of the foreign Eaton employees have not been shown to be relevant to a legitimate purpose. *Eaton I*, 2012 WL 3486910, at *15. Therefore, the undersigned recommends the Court DENY the Petition to Enforce IRS Summons (Doc. No. 1) on this ground.

**B. GDPR**

Respondent argues that because Petitioner "has not met the heightened legal standard to enforce a summons for personnel records," this Court "need not address any other issues." (Doc. No. 12 at 7.) However, in the event "the IRS's petition survives the legal test above, it should be denied for another reason: compliance with the summons would require Eaton to violate the European Union's General Data Protection Regulation ("GDPR") and expose itself to private lawsuits or regulatory actions that could result in significant fines and administrative penalties," a result that "is entirely avoidable because the IRS can obtain any relevant information through other means." (*Id.*) Respondent argues that the comity factors in *Societe Nationale Industrielle Aerospatiale v. U.S. District Court for the Southern District of Iowa*, 482 U.S. 522 (1987) ("*Societe Nationale*") support denial of the IRS's Petition in recognition of foreign data privacy law. (*Id.* at 9-10.)

Petitioner responds that "district courts across the country have ordered production of records in the face of GDPR objections," and that even if the GDPR applies, there would seem to be two derogations that would allow disclosure in this case. (Doc. No. 13 at 9.) Petitioner notes that "[t]he Court might also reasonably ask why, if employee names are protected by the GDPR, *see* ECF No. 12 at 8 n.4, Eaton has not already violated the GDPR simply by producing the spreadsheet containing a list of its global R&D personnel." (*Id.*) Petitioner argues that the comity factors in *Societe Nationale* "mostly favor the government" in this case. (*Id.* at 9-10.)

Respondent disputes that either of the two exceptions to the GDPR allow disclosure in this case and maintains that Petitioner "misapplies several *Societe Nationale* factors." (Doc. No. 16 at 4-5.)

As another district court has recently explained:

> The GDPR, adopted and implemented by the European Parliament in mid-2016, concerns the data protection and privacy of all EU citizens. Critical to the present dispute is the GDPR's regulation of the transfer of EU citizens' personal data

10

outside of EU member states, such as transfer to the U.S. The GDPR broadly defines personal data as "any information relating to an identified or identifiable natural person." GDPR Article 4(1).2 This broad definition of personal data inherently includes information like an individual's name and job title, information that is generally considered benign in U.S. litigation and must be produced in discovery pursuant to the Federal Rules of Civil Procedure.

\* \* \*

As a threshold matter, in determining whether the compelled discovery at issue is protected from disclosure under the GDPR, the Court notes that "the party relying on foreign law has the burden of showing such law bars production." AstraZeneca LP v. Breath Ltd., No. 08-1512 (RMB) (AMD), 2011 WL 1421800, at *11 (D.N.J. Mar. 31, 2011) (quoting In re Air Crash at Taipei, Taiwan on Oct. 31, 2000, 211 F.R.D. 374, 377 (C.D. Cal. 2002) (internal quotations omitted)). "[E]ven where a party seeks to prevent disclosure of documents based on a foreign law, ... the United States Supreme Court expressly stated that a foreign statute does 'not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute.'" Id. (quoting Société Nationale, 482 U.S. at 544 n.29). Rather, in this scenario, the Court employs a comity analysis set forth in the Restatement (Third) of Foreign Relations Law § 442(1)(c) and adopted by the Supreme Court in Société Nationale to weigh "the interests of the United States and the party seeking discovery against the foreign state's interest in secrecy." Id. at *11 (citing In re Air Crash at Taipei, 211 F.R.D. at 377). The international comity analysis requires the Court to consider five factors:

> (1) the importance to the litigation of the documents or other information requested; (2) the degree of specificity of the request; (3) whether the information originated in the United States; (4) the availability of alternative means of securing the information; and (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interest of the state where the information is located.

Société Nationale, 482 U.S. at 544 n.28.

*In re Mercedes-Benz Emissions Litigation*, Civil Action No. 16-cv-881 (KM) (ESK), 2020 WL 487288, at **1, 6 (D.N.J. Jan. 30, 2020).

Petitioner disputes that the GDPR even applies, citing two derogations it maintains "would seem to apply here": (1) allowing disclosure under Art. 49(1)(d) "'when necessary for important reasons of public

11

interest'" or (2) allowing disclosure under Art. 49(1)(e) as "'necessary for the establishment, exercise or defense of legal claims.'" (Doc. No. 13 at 9.)

As Respondent points out (Doc. No. 16 at 4), the derogation for important reasons of public interest is expressly limited as follows: "The public interest referred to in point (d) of the first subparagraph of paragraph 1 shall be recognised in Union law or in the law of the Member State to which the controller is subject." Art. 49 GDPR, available at: https://gdpr.eu/article-49-when-can-personal-data-be-transfered/ (last visited Jan. 3, 2024).

As for the derogation under Art. 49(1)(e), allowing disclosure where "necessary for the establishment, exercise or defence of legal claims":

> A data transfer in question may only take place when it is **necessary** for the establishment, exercise or defense of the legal claim in question. This "necessity test" requires a close and substantial connection between the data in question and the specific establishment, exercise or defense of the legal position.[] The mere interest of third country authorities or possible "good will" to be obtained from the third country authority as such would not be sufficient.
>
> Whilst there may be a temptation for a data exporter to transfer all possibly relevant personal data in response to a request or for instituting legal procedures, this would not be in line with this derogation or with the GDPR more generally as this (in the principle of data minimization) emphasizes the need for personal data to be adequate, relevant and limited to what is necessary in relation to the purposes for which they are processed.
>
> In relation to litigation proceedings the WP29, predecessor of the EDPB, has already set out a layered approach to the question of whether the personal data should be transferred, including the application of this principle. As a first step, there should be a careful assessment of whether anonymized data would be sufficient in the particular case. If this is not the case, then transfer of pseudonymized data could be considered. If it is necessary to send personal data to a third country, its relevance to the particular matter should be assessed before the transfer – so only a set of personal data that is actually necessary is transferred and disclosed.

Guidelines 2/2018 on derogations of Article 49 under Regulation 2016/679, Adopted on 25 May 2018, available at:

https://edpb.europa.eu/sites/default/files/files/file1/edpb_guidelines_2_2018_derogations_en.pdf (last visited Jan. 3, 2024) (emphasis in original) (footnote omitted). As the Court found above, Petitioner has not shown the relevance of the employee evaluations to its investigation, let alone the necessity of this information to the establishment, exercise, or defense of legal claims. Therefore, the Court concludes that these two derogations do not allow for transfer of protected information in this case.

However, that is not the end of the matter. "'[E]ven where a party seeks to prevent disclosure of documents based on a foreign law, ... the United States Supreme Court expressly stated that a foreign statute does 'not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute.'" *In re Mercedes-Benz Emissions Litigation*, 2020 WL 487288, at *6 (quoting *AstraZeneca LP v. Breath Ltd.*, No. 08-1512 (RMB) (AMD), 2011 WL 1421800, at *11 (D.N.J. Mar. 31, 2011)) (additional citation and internal quotation marks omitted). Therefore, the Court conducts the requisite five-factor comity analysis set forth *supra*.

**1. The importance to the litigation of the documents or other information requested.**

As another district court has explained:

> Jurists evaluating the "importance" of the requested discovery to the litigation have offered different formulations of the "importance" prong. Some circuits articulate an exceedingly high bar. For instance, the Ninth Circuit hesitates to compel production unless the outcome of litigation "stand[s] or fall[s] on the present discovery order." *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1475, (9th Cir. 1992) (quoting *In re Westinghouse Elec. Corp. Uranium Contracts Litig.*, 563 F.2d 992, 999 (10th Cir. 1977)). Courts in the District of Columbia evaluate whether the sought materials are "absolutely essential" to the case. *In re Vitamins Antitrust Litig.*, No. 99-197TFH, 2001 WL 1049433, at *9 (D.D.C. June 20, 2001). The Fifth Circuit has not provided guidance regarding the degree of "importance" necessary to assuage comity concerns under *Société Nationale*, but the Eastern District of Texas has used language suggesting that the sought evidence must "be critical or compelling." *Seoul Semiconductor Co. v. Nichia Corp.*, 590 F. Supp. 2d 832, 835 (E.D. Tex. 2008).

*In re: Xarelto (Rivaroxaban) Products Liability Litigation*, MDL NO. 2592, 2016 WL 3923873, at *14 (E.D. La. July 21, 2016). The Eastern District of Pennsylvania more recently found that, "[i]n analyzing these factors, the importance of the documents to the litigation weighs in favor of disclosure when 'there is a substantial likelihood that the documents will prove to be important to the prosecution of plaintiffs' claims.'" *Giorgi Global Holdings, Inc. v. Smulski*, CIVIL ACTION NO. 17-4416, 2020 WL 2571177, at *1 (E.D. Pa. May 21, 2020) (quoting *Laydon v. Mizuho Bank, Ltd.*, 183 F. Supp. 3d 409, 420 (S.D.N.Y. 2016)).

Regardless of the formulation used, as the Court found above, Petitioner has not shown the relevance of the employee evaluations to its investigation, let alone the importance of these documents to its investigation. Therefore, this factor weighs against disclosure.

**2. The degree of specificity of the request.**

"Under the second factor—the degree of specificity of the requests—'the Court examines the extent to which the discovery requests will burden the party from whom production is sought[,] as generalized searches for information, disclosure of which is prohibited under foreign law, are discouraged.'" *In re Mercedes-Benz Emissions Litigation*, 2020 WL 487288, at *7 (quoting *AstraZeneca LP*, 2011 WL 1421800, at *13) (additional citation and internal quotation marks omitted).

While Petitioner is correct that the request concerns a "specific, discrete set of records" (Doc. No. 13 at 10), Respondent is also correct that the summons requests the full evaluations for 25 foreign employees, "without specifying the relevant substantive information (if any) that is to be produced from each evaluation." (Doc. No. 12 at 9.) Therefore, this factor is either neutral or weighs slightly against disclosure.

**3. Whether the information originated in the United States.**

"With respect to the third factor—whether the information originated in the United States—the Court looks to whether 'the documents to be disclosed and people who will produce those documents are

14

located in a foreign country' or in the United States." *In re Mercedes-Benz Emissions Litigation*, 2020 WL 487288, at *7 (quoting *AstraZeneca LP*, 2011 WL 1421800, at *13) (additional citation omitted).

Respondent represents that the summonsed employee performance evaluations originated outside of the United States, which Petitioner does not dispute. Therefore, this factor weighs against disclosure.

**4. The availability of alternative means of securing the information.**

"As to the fourth factor—the availability of alternative means for securing the information sought—the Court looks to whether 'the information sought in discovery can easily be obtained elsewhere.'" *Id.* (quoting *AstraZeneca LP*, 2011 WL 1421800, at *14) (additional citation omitted). "If it can be easily obtained elsewhere, 'there is little or no reason to require a party to violate foreign law.'" *Id.*

Respondent argues that there are alternative means for Petitioner to obtain the information it seeks, including virtual transcribed interviews with the foreign employees in question or their supervisors. (Doc. No. 12 at 10.) Petitioner argues that Respondent "has not identified any alternative contemporaneous records showing which employees worked on which projects and where various projects were in their development cycles." (Doc. No. 13 at 10.) Respondent replies that Petition misapplies this factor, as "[t]he information sought is available via the employee interviews Eaton has offered, and the factor does not require (as the government's argument implies) that the information be available via alternative 'contemporaneous' documents." (Doc. No. 16 at 5.)

As the Court found above, Petitioner has not offered any explanation as to why the alternatives offered by Respondent are inadequate means for it to obtain the project-specific information it seeks. Therefore, this factor weighs against disclosure.

> 5. **The extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.**

"The fifth factor—the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the foreign state where the information is located—is the most important factor in determining whether to compel production." *In re Mercedes-Benz Emissions Litigation*, 2020 WL 487288, at *8 (quoting *AstraZeneca LP*, 2011 WL 1421800, at *14) (additional citation omitted). "'In considering such national interests, the Court must 'assess the interests of each nation in requiring or prohibiting disclosure, and determine whether disclosure would affect important substantive policies or interests of either the United States or [Germany].'" *Id.* (quoting *AstraZeneca LP*, 2011 WL 1421800, at *14) (additional citation and internal quotation marks omitted).

Respondent recognizes that the United States "has an interest in tax compliance and enforcement," but argues "the IRS has not demonstrated the relevance of the employee evaluations to its transfer pricing investigation" and "[i]t is unclear how noncompliance would undermine the United States' interest in this case." (Doc. No. 12 at 10.) Petitioner argues that "the request relates to issues that are extremely important to the United States (factor 5) because 'taxes are the lifeblood of government,' *Bull v. United States*, 295 U.S. 247, 259 (1935), and the IRS requires the records for purposes of determining the U.S. tax liability of a U.S. taxpayer." (Doc. No. 13 at 10.) Respondent argues that Petitioner misapplies the fifth factor, as the "United States' overall interest in collecting taxes would not be undermined by the IRS's inability to review a few individuals' performance evaluations; in contrast, each individual's privacy interest is of grave importance. *See* GDPR Recital 1 (data privacy 'is a fundamental right')." (Doc. No. 16 at 5.)

The Court recognizes the significant interest the United States has in tax compliance and enforcement. However, where, as here, Petitioner has not shown the relevance of the employee evaluations

16

to its investigation,[1] nor has Petitioner offered any explanation as to why the alternatives offered by Respondent are inadequate means for it to obtain the project-specific information it seeks, the Court agrees with Respondent that it is unclear how non-compliance would undermine the United States' important interests in this case. Therefore, this factor is either neutral or weighs slightly against disclosure.

As the balance of the comity factors weigh against disclosure, the undersigned recommends that the Court DENY the Petition to Enforce IRS Summons on this ground.

### III. Conclusion

For all the reasons set forth above, the undersigned recommends the Court DENY the Petition to Enforce IRS Summons. (Doc. No. 1.)

Date: January 4, 2024

*s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).

---

[1] As evidenced by this Court's decision, it is the lack of relevance to the IRS's investigation that necessitates the result in this case on both grounds.