UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

---

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 1:23-mc-00037 |
|  | : |  |
| Petitioner, | : | OPINION & ORDER |
|  | : | [Resolving Docs. 1, 17, 18] |
| v. | : |  |
|  | : |  |
| EATON CORPORATION, | : |  |
|  | : |  |
| Respondent. | : |  |
|  | : |  |

JAMES S. GWIN, UNITED STATES DISTRICT COURT JUDGE:

In this case, the government petitions the Court to enforce an Internal Revenue Service (IRS) administrative summons issued to Respondent Eaton Corporation.  The Court referred the government's petition to a Magistrate Judge for a report and recommendation (R&R).

Before the Magistrate Judge issued his R&R, the parties reached an agreement over many of the summonsed documents.  After reaching this agreement, only a single dispute remained: whether Eaton needed to produce certain foreign employees' performance evaluations.

Respondent Eaton argues that the government has not satisfied its IRS summons enforcement burden as to those foreign employees' performance evaluations.  And according to Eaton, even if the government had met its burden, the European Union's (EU) privacy law—the General Data Protection Regulation (GDPR)—prohibits Eaton from producing those performance evaluations to the IRS.  So, Eaton says, comity requires the Court to not enforce the IRS summons as to those evaluations.

The Magistrate Judge agreed with Eaton and recommended that the Court deny the government's petition.  The government timely filed objections.

Case No. 1:23-mc-00037
GWIN, J.

Because the government has met its burden to enforce the IRS summons and neither the GDPR nor comity prevent enforcement, the Court **SUSTAINS** the government's objections, **REJECTS** the R&R, and **ENFORCES** the IRS administrative summons as to the foreign employees' performance evaluations.

## I.    BACKGROUND

The IRS is conducting a federal income tax audit for the 2017–19 tax years.  The tax audit centers on whether Respondent Eaton violated transfer pricing rules after Eaton assigned certain intellectual property rights to Eaton's Irish affiliate.  Specifically, the IRS is investigating whether, after it transferred ownership rights to its Irish affiliate, Eaton improperly lowered its United States tax burden by paying inflated royalties to its Irish affiliate for the right to use the intellectual property.

To understand why transfer pricing can be a concern, consider what happens when a U.S. company purchases supplies from foreign company.  By spending money on purchasing supplies, the U.S. company incurs costs.  Those costs are deductible,[1] so the costs reduce the U.S. company's taxable income.  By the same token, the money that the foreign company receives for those supplies is taxable income, so the foreign company's tax burden increases.

There is nothing concerning about such a business transaction when the transaction runs between two independent companies and is negotiated at arm's length.  But there is abuse potential when a company internally transfers assets between its U.S. and foreign affiliates.  Especially when the foreign affiliate operates in a jurisdiction with lower corporate tax rates.

---

[1] *Eaton Corp. & Subsidiaries v. Comm'r*, 47 F.4th 434, 437 (6th Cir. 2022).

Case No. 1:23-mc-00037
GWIN, J.

Because the two affiliates are formally separate entities that pay taxes to different governments, the two affiliates must separately account for their profits and losses.

For example, if the U.S. affiliate pays royalties to use the foreign affiliate's intellectual property, those royalties are accounted for as costs to the U.S. affiliate (reducing tax burden) and profit to the foreign affiliate (increasing tax burden).  Transfer price refers to this intracompany accounting.

However, the U.S. and foreign affiliate operate under the same corporate umbrella, so the profits and losses incurred by transferring assets between the two affiliates do not affect the parent company's bottom line.  To save taxes for the parent company, the two affiliates could inflate transfer pricing to artificially reduce taxable income in high-tax countries while artificially increasing taxable income in low-tax countries.

Driven by these concerns, Congress enacted I.R.C. § 482.[2]  Along with its implementing regulations, § 482 gives the IRS authority to adjust transfer price to what a "counterfactual arm's-length transaction 'with an uncontrolled taxpayer'" would have yielded.[3]

In seeking to determine the hypothetical transfer price that an arm's length negotiation between Eaton and its Irish affiliate would have yielded, the IRS served administrative summons on Eaton.  The summons requested employee performance evaluations from certain domestic and foreign Eaton employees.

The IRS says that these performance evaluations will allow it to assess how much domestic employees contributed to the intellectual property at issue as compared to how

---

[2] *Eaton Corp. & Subsidiaries*, 47 F.4th at 437.
[3] *Id.* (quoting Treas. Reg. § 1.482-1(b)(1)).

- 3 -

Case No. 1:23-mc-00037
GWIN, J.

much foreign employees contributed.[4]  This, the IRS says, will allow it to determine the appropriate way to allocate that intellectual property's value between Eaton and Eaton's Irish affiliate for transfer pricing purposes.

Eaton did not comply with the IRS's summons, so the government filed a petition to enforce the summons.[5]  This Court referred the government's petition to a Magistrate Judge for an R&R.[6]  While the referral was pending, the parties settled regarding domestic employee performance evaluations.[7]

But the parties continued to disagree on whether Eaton needed to produce foreign employee performance evaluations.

The parties briefed this issue to the Magistrate Judge.[8]  The Magistrate Judge then issued an R&R recommending that the Court deny the government's enforcement petition as to Eaton's foreign employee performance evaluations.[9]  The government timely objected,[10] and the parties fully briefed the government's objections.[11]

## II.  DISCUSSION

Respondent Eaton makes two arguments against enforcing the IRS summons.  First, Eaton says that the government has failed to meet its burden for enforcing the IRS summons.  Second, Eaton says that even if the government met its burden, the Court should not enforce the summons under comity principles because EU privacy law (the GDPR) prohibits Eaton

---

[4] Doc. 13-1 at ¶ 10.
[5] Doc. 1.
[6] Doc. 2.
[7] Docs. 9, 11.
[8] Docs. 12, 13, 16.
[9] Doc. 17.
[10] Doc. 18.
[11] Docs. 19, 20-1.

Case No. 1:23-mc-00037
GWIN, J.

from sending employee performance evaluations to the United States.  Neither argument

succeeds.

## A.  IRS Summons Enforcement

Congress has granted the IRS "expansive information-gathering authority" to

determine if taxes have been properly paid.[12]  Consistent with this information-gathering

authority's expansiveness, the government must satisfy only a minimal burden before it can

enforce an IRS summons.

Specifically, the government need only make a prima facie case showing "[1] that the

investigation will be conducted pursuant to a legitimate purpose, [2] that the inquiry may be

relevant to the purpose, [3] that the information sought is not already within the [IRS]

Commissioner's possession, and [4] that the administrative steps required by the Code have

been followed."[13]

The required prima facie showing is not very demanding.[14]  Often, the government

can make the necessary showing by simply submitting an affidavit from the IRS agent who

issued the administrative summons.[15]

Once the government makes its prima facie showing, the burden shifts to the

responding party.  At this point, the responding party must show that enforcing the summons

would be an "abuse of the court's process" in order to defeat enforcement.[16]  In contrast to

the government's light burden, the responding party's burden is "a heavy one."[17]

---

[12] *Byers v. U.S. Internal Revenue Serv.*, 963 F.3d 548, 552 (6th Cir. 2020) (quoting *United States v. Arthur Young & Co.*, 465 U.S. 805, 816 (1984)).
[13] *Id.* (quoting *United States v. Powell*, 379 U.S. 48, 57–58 (1964)) (numberings added; other alterations in original).
[14] *Id.* ("[T]his prima-facie burden 'isn't much of a hurdle.'") (quoting *2121 Arlington Heights Corp. v. I.R.S.*, 109 F.3d 1221, 1224 (7th Cir. 1997)).
[15] *United States v. Monumental Life Ins. Co.*, 440 F.3d 729, 733 (6th Cir. 2006); *Kondik v. United States*, 81 F.3d 655, 656 (6th Cir. 1996); *United States v. Will*, 671 F.2d 963, 966 (6th Cir. 1982).
[16] *Kondik*, 81 F.3d at 656 (citation omitted).
[17] *Id.* (citing *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 316 (1978)).

Case No. 1:23-mc-00037
GWIN, J.

### 1. Prima Facie Case

Respondent Eaton focuses its challenge solely on the prima facie case's relevance element.  Eaton argues that the summonsed foreign employee performance evaluations are not relevant enough to the IRS's transfer pricing investigation to justify enforcing the IRS summons.  The Magistrate Judge agreed.  But in reaching that conclusion, the Magistrate Judge placed too high a burden on the government.

The Magistrate Judge applied a heightened relevance standard to the IRS's summons because the summons involved employee personnel records.[18]  The Magistrate Judge required this heightened relevance standard in reliance upon a district court's decision in a previous IRS summons dispute between Eaton and the government—*Eaton I*.[19]

In *Eaton I*, Respondent Eaton argued that federal law requires a "*compelling* showing of relevance" before courts can order personnel records to be produced.[20]  The *Eaton I* court accepted that argument, denying the IRS's request for employee performance evaluations because the IRS failed to "persuasively demonstrate[] the relevance of [an employee]'s performance evaluations."[21]

The Court disagrees with *Eaton I*.  To justify the higher relevance standard, *Eaton I* cited to a non-binding district court case involving civil discovery.[22]  And in defending the *Eaton I* standard, Respondent Eaton similarly relies on cases about civil discovery.[23]

---

[18] Doc. 17 at 5–9.
[19] *United States v. Eaton Corp.*, Nos. 12-mc-24, 12-mc-25, 12-mc-26, 12-mc-27, 2012 WL 3486910 (N.D. Ohio Aug. 15, 2012) ("*Eaton I*").
[20] *Id.* at *13.
[21] *Id.* at *14.
[22] *Id.* at *13 (citing *Miller v. Fed. Express Corp.*, 186 F.R.D. 376, 384–85 (W.D. Tenn. 1999)).
[23] Doc. 19 at 5–6 (collecting cases).

Case No. 1:23-mc-00037
GWIN, J.

Civil discovery, though, operates under a different framework than IRS summons enforcement actions.  Congress has not provided the same "expansive" investigative authority to civil litigants that Congress gave to the IRS.

Civil litigants can only seek discovery that "is relevant . . . and proportional to the needs of the case."[24]  Put differently, civil discovery weighs relevance against burden.  By contrast, the IRS's summons authority is much broader.

For one, the IRS summons standard does not require a court to weigh relevance against burden.  In fact, the Supreme Court has rejected a requirement that "the IRS must conduct its investigations in the least intrusive way possible."[25]

The IRS summons relevance standard is also less demanding than the civil discovery relevance standard.  I.R.C. § 7602, which creates the IRS's summons authority, allows the IRS to request any documents that "*may* be relevant" to the IRS's investigation.[26]  This means that "even *potential* relevance to an ongoing [IRS] investigation" justifies an IRS summons.[27]  Put differently, the IRS "should not be required to establish that the documents it seeks are actually relevant in any technical, evidentiary sense."[28]

Given that IRS summons authority is broader than civil discovery, there is little reason to import civil discovery limitations into the IRS summons context.  In fact, the opposite is true: courts should avoid bringing civil discovery limitations into IRS summons enforcement actions.  That is because, "[w]hile § 7602 is subject to the traditional privileges and

---

[24] Fed. R. Civ. P. 26(b)(1).
[25] *Tiffany Fine Arts, Inc. v. United States*, 469 U.S. 310, 323 (1985).
[26] I.R.C. § 7602(a)(1) (emphasis added).
[27] *Arthur Young*, 465 U.S. at 814.
[28] *Id.*

Case No. 1:23-mc-00037
GWIN, J.

limitations, any other restrictions upon the IRS summons power should be avoided absent

unambiguous directions from Congress."[29]

The Court is not aware of any an unambiguous Congressional instruction protecting

employee personnel records from IRS summons, nor has Eaton pointed to one. And at least

one court has explicitly rejected the argument that employee privacy concerns defeat an IRS

summons.[30]

As that court observed, "IRS investigations 'unquestionably involve some invasion of

privacy.'"[31] The IRS regularly handles sensitive and private taxpayer financial information.

It would be strange to carve out employee personnel records for greater protection from IRS

summons authority while allowing equally (or more) sensitive financial records to be

requested under the usual low IRS summons relevance bar.

Applying the correct "may be relevant" standard, the Court finds that the government

has made a prima facie relevance showing.

Through an IRS agent declaration, the government explained that, according to

multiple Eaton employee interviews, Eaton's employee performance evaluations are likely

to contain information about employees' work on the intellectual property at issue in this

IRS investigation.[32] Specifically, the performance evaluations might quantify how much an

employee matured a technology, track technology project milestones, or document how

successfully an employee completed her projects.[33]

---

[29] *Arthur Young,* 465 U.S. at 816 (internal quotation marks and citations omitted).
[30] *2121 Arlington Heights,* 109 F.3d at 1225.
[31] *Id.* (quoting *United States v. Bisceglia,* 420 U.S. 141, 146 (1975)).
[32] Doc. 13-1 at ¶¶ 5–9.
[33] *Id.*

- 8 -

Case No. 1:23-mc-00037
GWIN, J.

The IRS agent said that this type of information could show how much control Eaton maintained over its intellectual property even after that intellectual property was transferred to Eaton's Irish affiliate.[34]  In turn, information about Eaton's control level over the transferred intellectual property could help the IRS determine how much of that intellectual property's value should be attributed to Eaton.

The government did not need to establish relevance with any particular certainty.  The government needed only to show that the performance evaluations sought *might* be relevant. The IRS's reasons for requesting those evaluations, backed by interviews, are enough to make out the necessary prima facie case.[35]

### 2.  Burden Shifting

Respondent Eaton's two counterarguments against enforcement also do not meet Eaton's heavy burden to show an abuse of process.

To begin, Eaton argues that its employee performance evaluations are not relevant to the IRS's transfer pricing investigation.  To make this argument, Eaton relies on affidavits from its Vice President of Tax.  With those affidavits, Eaton's Vice President points to evidence suggesting that the requested performance evaluations do not contain the information that the IRS seeks.[36]

But Eaton's burden is not simply to negate the government's prima facie case.[37]  Eaton must go further and show that there is an abuse of process.  Perhaps a lack of relevance could

---

[34] Doc. 13-1 at ¶ 10.

[35] Respondent Eaton did not contest the other three prima facie elements, and the Court notes that the government satisfied those elements through an IRS agent's declaration.  *See* Doc. 1-1.

[36] Doc. 16-1 at ¶¶ 6–7.

[37] Parties cannot offer opposing evidence to defeat a prima facie case.  *See Prima Facie Case, Black's Law Dictionary* (11th ed. 2019) (noting that the prima facie standard tests whether the proponent of the prima facie case has "produc[ed] enough evidence to allow the fact-trier to infer the fact at issue," not whether the opposing party has rebutted the proponent's argument with the opposing party's own evidence); *cf. Cline v. Cath. Diocese of Toledo*, 206 F.3d 651, 663 n.7 (6th Cir. 2000) (collecting cases holding that courts should not consider a defendant's opposing evidence at the prima facie stage of

Case No. 1:23-mc-00037
GWIN, J.

support an abuse of process argument if the requested performance evaluations were so obviously irrelevant that the IRS's request would do nothing more than harass Eaton. That is not the case here.

At most, the competing IRS and Eaton declarations and affidavits show a legitimate disagreement about what information the evaluations contain and their relevance. Because § 7602 authorizes the IRS to summons even *potentially* relevant documents,[38] mere disagreement does not show an abuse of process. If the IRS has a good faith belief in the requested documents' relevance, § 7602 expressly allows the IRS to summons those documents even if the IRS's belief ends up being misplaced. As the Court discussed above, the government has met that low relevance bar.

Eaton's second counterargument fares no better. Eaton says that instead of producing the requested employee performance evaluations, Eaton is willing to make those employees available for interviews. Eaton suggests that the IRS's refusal to take Eaton's offer should defeat the government's enforcement action.

Again, this argument is not enough to show an abuse of process. The IRS has legitimate reasons to request the performance evaluations rather than employee interviews. Employee interviews might not be as useful as the contemporaneous employee performance evaluations because the employees' memories might have faded. And the performance evaluations might also help guide the IRS's questions during later employee interviews.

---

a Title VII *McDonnell Douglas* analysis). Rather, parties must show that the government's own affidavits and evidence are insufficient to establish a prima facie case. Therefore, Eaton's arguments based on Eaton's own opposing evidence go towards Eaton's burden to show abuse of process, not towards the government's prima facie burden.

[38] I.R.C. § 7602(a)(1) (the IRS can summons documents that "may be relevant" to the IRS's investigation).

- 10 -

Case No. 1:23-mc-00037
GWIN, J.

More fundamentally, the IRS does not need to conduct its investigation in the least intrusive way.[39]  There is no abuse of process when the IRS turns down a potentially less intrusive avenue for investigation.

Perhaps if the IRS's chosen investigative methods were significantly more intrusive than reasonable alternatives, that fact might support an abuse of process finding.  But that is not the case here.

In some ways, making employees available for interview is *more* intrusive than producing the employees' performance evaluations because such interviews distract the employees from their job duties.  And those distractions multiply if Eaton needs to take the time to prepare the employees for interviews as well.

Producing a small set of documents, on the other hand, would take less time and would allow Eaton's employees to continue working on their responsibilities.

Respondent Eaton is effectively arguing that the IRS must follow Eaton's preferred investigatory methods.  There is no authority justifying that stance.

*        *        *

The government has met its burden to show a prima facie case for enforcing the IRS summons at issue here.  And Eaton has failed to rebut that showing by demonstrating enforcement would be an abuse of process.  Therefore, the IRS can enforce its summons against Eaton.

---

[39] *Tiffany Fine Arts,* 469 U.S. at 323.

- 11 -

Case No. 1:23-mc-00037
GWIN, J.

### B. Foreign Law Considerations

Next, Eaton argues that whether the government has met its enforcement burden, European privacy law blocks Eaton from producing the foreign employee performance evaluations.

However, "[f]oreign 'blocking statutes' do not 'deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute.'"[40]

Although foreign law may bar an American court from ordering a document production, foreign law does so only when (1) producing the requested documents would violate foreign law, and (2) comity analysis weighs in favor of denying the requested documents.[41]  The party opposing production bears the burden of satisfying this two-part test.[42]

### 1.  Foreign Privacy Law

Respondent Eaton says that producing the foreign employee performance evaluations would violate a European Union (EU) regulation known as the GDPR.[43]

The GDPR is a comprehensive privacy regulation that protects European citizens' personal data.  The GDPR's scope is broad, covering "any information relating to an

---

[40] *Owen v. Elastos Found.*, 343 F.R.D. 268, 282 (S.D.N.Y. 2023) (quoting *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 544 n.29 (1987)).

[41] *Kashef v. BNP Paribas S.A.*, No. 16-cv-3228 (AKH) (JW), 2022 WL 1617489, at *2 (S.D.N.Y. May 23, 2022) (citations omitted).

[42] *Knight Cap. Partners Corp. v. Henkel Ag & Co., KGaA*, 290 F. Supp. 3d 681, 689 (E.D. Mich. 2017) (citation omitted); *In re Air Crash at Taipei, Taiwan on Oct. 31, 2000*, 211 F.R.D. 374, 377 (C.D. Cal. 2002) (quoting *United States v. Vetco, Inc.*, 691 F.2d 1281, 1288 (9th Cir. 1981)).

[43] The IRS requested performance evaluations for two Indian employees not covered by the GDPR.  While Eaton says that India recently passed a GDPR-like privacy law, that privacy law has not yet come into effect.  So, Eaton must produce the Indian employees' performance evaluations because the government has met its enforcement burden.

- 12 -

Case No. 1:23-mc-00037
GWIN, J.

identified or identifiable natural person."[44]  Employee performance evaluations are protected

personal data under the GDPR's broad scope.

As relevant in this case, the GDPR generally prevents companies from transferring

European citizens' personal data outside of EU member states.[45]  This general prohibition on

transfer includes transfers to the United States.[46]

So, unless a GDPR exception (known as a derogation) applies, Respondent Eaton

would be violating the GDPR by producing its foreign employee performance evaluations to

the IRS.

Here, the GDPR Article 49(1)(d) derogation applies, which permits personal-data

transfers out of the EU when "the transfer is necessary for important reasons of public

interest."[47]

The European Data Protection Board has promulgated guidance regarding this

"important public interest derogation."[48]  In its guidance, the Data Protection Board explains

that this derogation has two elements: (1) that the transfer is necessary or legally required,

and (2) that the transfer is based on important public interest grounds.[49]

In this case, producing the foreign employee performance evaluations is legally

required because the government has satisfied its summons enforcement burden.

The remaining issue is whether such production is based on an important public

interest.  On this point, the Data Protection Board's guidance makes clear that "only public

---

[44] *In re Mercedes-Benz Emissions Litig.*, No. 16-cv-881 (KM) (ESK), 2020 WL 487288, at *1 (D.N.J. Jan. 30, 2020) (quoting GDPR Art. 4(1)).
[45] *Id.*
[46] *Id.*
[47] GDPR Art. 49(1)(d).
[48] Eur. Data Prot. Bd., *Guidelines 2/2018 on Derogations of Article 49 Under Regulation 2016/679* at 10–11, https://www.edpb.europa.eu/sites/default/files/files/file1/edpb_guidelines_2_2018_derogations_en.pdf [hereinafter *GDPR Guidance*].
[49] *Id.* at 10.

Case No. 1:23-mc-00037
GWIN, J.

interests recognized in [European] Union law or in the law of the Member State to which the [personal data's] controller is subject can lead to the application of this derogation."[50]

It is not enough that an EU member state and the country seeking the European personal data share a common public interest in the abstract.[51] For example, the fact that both the United States and Ireland have an interest in accurately collecting taxes does not support applying the public interest derogation.

Rather, the public interest derogation applies only when "it can also be deduced from EU law or the law of the member state to which the controller is subject that such data transfers are allowed for important public interest purposes including in the spirit of reciprocity for international cooperation."[52] "The existence of an international agreement or convention which recognises a certain objective and provides for international cooperation to foster that objective can be an indicator when assessing the existence of a public interest . . . as long as the EU or the Member States are a party to that agreement or convention."[53]

Such an international convention exists between Ireland (the EU member state where Eaton's foreign affiliate is located) and the United States. Specifically, the two countries signed a tax convention in 1997.[54]

As the tax convention's preamble indicates, the convention's objective is "the prevention of fiscal evasion with respect to taxes on income and capital gains."[55]

---

[50] *GDPR Guidance* 10.
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Convention Between the Government of the United States of America and the Government of Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income and Capital Gains,* S. Treaty Doc. No. 105-31, 1997 WL 602448 (July 28, 1997) (" *U.S.-Ireland Tax Convention*").
[55] *Id.* at *4.

- 14 -

Case No. 1:23-mc-00037
GWIN, J.

Significantly, Article 7 offers principles for how business profits should be attributed between affiliated U.S. and Irish entities,[56] the crux of the IRS's tax investigation in this case.

Moreover, Article 27 expressly provides for cooperation and information sharing between the United States and Ireland to achieve the tax convention's purposes.[57]

The U.S.-Ireland tax convention therefore satisfies the important public interest derogation. Eaton would not violate European law by producing foreign employee performance evaluations, and Eaton must produce those evaluations.

### 2. Comity Analysis

Even if producing the foreign employee performance evaluations would violate the GDPR, the comity analysis weighs in favor of enforcing the IRS summons. The comity analysis requires the Court to weigh five factors:

> (1) the importance to the litigation of the documents or other information requested;
>
> (2) the degree of specificity of the request;
>
> (3) whether the information originated in the United States;
>
> (4) the availability of alternative means of securing the information; and
>
> (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interest of the state where the information is located.[58]

Of these factors, balancing the relevant countries' national interests is the most important.[59] So, the Court begins with the countries' interests.

---

[56] *U.S.-Ireland Tax Convention*, 1997 WL 602448 at *9–10.

[57] *Id.* at *27–28.

[58] *Société Nationale*, 482 U.S. at 544 n.28 (citation omitted).

[59] *In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 & 50 U.S.C. § 1705*, 381 F. Supp. 3d 37, 77 (D.D.C. 2019) (holding that "the interests of the relevant countries" is the "most important factor"), *aff'd sub nom. In re Sealed Case*, 932 F.3d 915 (D.C. Cir. 2019); *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1476 (9th Cir. 1992) (the "balance of national interests" is "the most important factor"); *Inventus Power v. Shenzhen Ace Battery*, 339 F.R.D. 487. 504 (N.D. Ill. 2021) (quoting *Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548, 558 (S.D.N.Y. 2012)).

Case No. 1:23-mc-00037
GWIN, J.

The United States has a paramount interest in collecting taxes, including investigating potential underpayment. That is because taxes and their collection are "the lifeblood of government."[60] So, compared to civil discovery, "[IRS] summonses appear to serve a more pressing national function."[61] And "[s]uch summonses are also more widely recognized in the international community than the broad civil discovery permitted in American courts."[62]

Along those lines, Ireland has little interest in blocking the United States' tax investigation. The U.S.-Ireland tax convention shows that Ireland has an interest in cooperating with the United States to ensure that taxes are appropriately allocated between the two countries.

True, the GDPR suggests that Ireland has an interest in protecting its citizens' private information, such as the performance evaluations at issue here. But Ireland's tax cooperation interest outweighs Ireland's privacy interest.

As discussed above, the GDPR's important public interest derogation allows European entities to send personal data abroad to serve interests found in an EU member state's treaty.[63] This shows that Ireland's specific treaty-based interests trump Ireland's general privacy interest.

Even if the public interest derogation did not formally apply, the derogation's existence suggests that Ireland's treaty-based interests at least significantly mitigate Ireland's

---

[60] *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350 (1977) (quoting *Bull v. United States*, 295 U.S. 247, 259 (1935)); *see also Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 21 (2000) (the government has a "vital interest . . . in acquiring its lifeblood, revenue").
[61] *Vetco*, 691 F.2d at 1288.
[62] *Id.* (citations omitted).
[63] *Supra* Section II.B.1.

- 16 -

Case No. 1:23-mc-00037
GWIN, J.

privacy interest.  So, the United States' tax collection interest in this case would still be far greater than Ireland's countervailing privacy interests.[64]

Therefore, the fifth factor—the countries' interests—weighs strongly in favor of enforcing the IRS summons.

However, the first four factors mostly cancel each other out.

The first factor weighs against enforcement because the performance evaluations are not particularly important to the IRS's investigation.  Although the government has shown that the evaluations may be relevant to the IRS investigation, that relevancy showing is weak.

The second factor weighs in favor of enforcement because the IRS summons is requesting a discrete and narrow document set.  The IRS requested 43 total performance evaluations over a three-year period.[65]  Because that number includes U.S. employee evaluations, the number of European employee evaluations at issue here is even less.

The third factor weighs against enforcement because the performance evaluations were created in Europe, not in the United States.

And the fourth factor weighs in favor of enforcement.  Although Eaton offers employee interviews as an alternative to producing performance evaluations, the Court explained above that interviews are not a perfect substitute.[66]  And the parties have not identified any other potential alternative to the performance evaluations.

Because two of the first four comity factors weigh in favor of enforcement while two weigh against, the first four factors are roughly are roughly neutral when taken together.  At best for Eaton, the four factors weigh slightly against enforcement.

---

[64] The government has also offered to allow Eaton to redact irrelevant but private information from the employee performance evaluations. Doc. 18 at 11 n.6.  This further reduces Ireland's privacy interest in this case.
[65] Doc. 1-1 at PageID #: 9–12.
[66] *Supra* Section II.A.2.

Case No. 1:23-mc-00037
GWIN, J.

But the fifth comity factor weighs strongly in favor of enforcement.  Adding the fifth (and most important) comity factor into the mix tilts the weighing towards enforcement.

For these reasons, the comity analysis favors enforcing the IRS summons.

## III.    CONCLUSION

The Court **GRANTS** the government's petition to enforce the IRS summons.  Because the government has offered to allow Eaton to redact some irrelevant but private information from the requested performance evaluations, the parties shall submit a stipulated protective order to the Court within **fourteen (14) days** of this Order.  The stipulated protective order should specify the redaction scope and any other privacy limitations that the parties agree are appropriate.   Eaton shall produce the requested foreign employee performance evaluations to the IRS within **fourteen (14) days** after the Court enters the parties' stipulated protective order.

IT IS SO ORDERED.


Dated: May 16, 2024                                    s/      *James S. Gwin*
                                                       JAMES S. GWIN
                                                       UNITED STATES DISTRICT JUDGE